IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MYRON ANTHONY HAUGHTON,           )
                                  )
          Petitioner              )
                                  )
     v.                           )          No. 1:16-cv-634 (LMB/IDD)
                                  )
JEFFREY CRAWFORD, et al.,         )
                                  )
          Respondents.            )

MEMORANDUM OPINION

Petitioner Myron Anthony Haughton has been held by the Department of Homeland

Security in an immigration detention facility since October 5, 2015. Compl., [Dkt. 1] ¶ 1. Due to

a series of burglary convictions earned while he was a teenager, Haughton is subject to

mandatory detention pursuant to 8 U.S.C. § 1226(c) while he awaits disposition of his removal

proceedings. Id. In June 2016, Haughton petitioned this Court for a writ of habeas corpus,

arguing that his prolonged detention violates the constitutional guarantee of due process and

requesting an individualized bond hearing. Id. ¶ 2. As of this writing, he has been detained for

over one year.

Before the Court is respondents' Motion for Summary Judgment. [Dkt. 4]. For the

reasons that follow, respondents' Motion will be denied, summary judgment will be granted for

the petitioner, and respondents will be ordered to hold an individualized bond hearing for

petitioner within thirty (30) days.

I.    BACKGROUND

Haughton entered the United States in August 1999, at the age of eleven. IJ Decision,

[Dkt. 1-1] at 2. Before his arrival in the United States, Haughton lived with his father and

stepmother in Kingston, Jamaica. Id. His father worked away from home Monday through Friday and his stepmother was physically abusive. Id. When Haughton was eleven, his biological mother visited him in Jamaica and arranged for him to join her in the United States. Id. He entered the United States by illegally impersonating a cousin who had documents permitting him to enter the country. Id. Shortly after arriving, Haughton realized that his mother had invited him to live with her in Maryland so that he would look after her three younger children. Id. at 3. Soon, she too was abusing him. After Haughton's teacher observed his bruises, she notified the authorities and Haughton was sent to live with an aunt. Id. Two years later, when the aunt decided she no longer wanted to care for him, Haughton was returned to his mother. Id. The abuse soon resumed and in 2004, at the age of sixteen, Haughton ran away. Id.

Shortly thereafter, a number of boys who Haughton had befriended persuaded him to participate in a series of car thefts and burglaries of unoccupied homes. Id. In April 2006, Haughton was arrested on multiple juvenile arrest warrants. Id. at 9; Tine Decl., [Dkt. 5-1] at ¶ 5. He was subsequently charged as an adult for two incidents that occurred in January 2006, shortly after his eighteenth birthday. Tine Decl., [Dkt. 5-1] at ¶ 5. Pending trial, Haughton was held in a juvenile detention facility. IJ Decision, [Dkt. 1-1] at 4. He escaped after one month in the facility by absconding with an employee's car but was apprehended while walking near a friend's house the following week. Id. Haughton ultimately pleaded guilty to the two January 2006 burglaries, specifically one count of Felony Theft and two counts of Felony First Degree Burglary, and was sentenced to five years imprisonment for each. Tine Decl., [Dkt. 5-1] at ¶ 6. The sentences ran concurrently, with three years suspended. Id.; IJ Decision, [Dkt. 1-1] at 4. Haughton served a total of eighteen months before being released on probation. IJ Decision, [Dkt. 1-1] at 4, 15.

In the ten years since his release, Haughton has "taken visible and concrete steps toward rehabilitation." Id. at 15. He successfully complied with the terms of his probation, worked toward his GED, and became involved with his local church. Id. at 4, 15. In 2007, Haughton began dating Tatiana Barrow. Id. at 4. Like petitioner, she had suffered from an abusive childhood, having been raised in a Russian orphanage after being removed from her parents' home for neglect. When she was fifteen years old, she was adopted by United States citizens. Id. at 5-6. Haughton and Barrow married in 2014. Pet. BIA Appeal, [Dkt. 8-2] at 43. They have two children together, Adelina, age six, and Ayden, age four, both United States citizens. Id. Although Haughton's employment opportunities have been limited by his undocumented status, he has held several jobs.[1] IJ Decision, [Dkt. 1-1] at 4. Before his detention, Haughton was the primary caretaker for his two young children, working with both of them on language, writing, and arithmetic skills. IJ Decision, [Dkt. 1-1] at 12-13.

On December 23, 2013, Haughton was arrested by Virginia law enforcement based on an outstanding bench warrant for driving without a license and driving on a revoked license in Maryland. Tine Decl., [Dkt. 5-1] ¶ 7. While Haughton was in the custody of Virginia law enforcement, Immigration and Customs Enforcement (ICE) discovered that he had entered the United States illegally. Id. at ¶ 7-8. On January 9, 2014, Haughton was transferred to ICE custody. Id. at ¶ 9. Based on Haughton's unlawful presence and convictions for burglary and theft, ICE issued a Notice of Intent to Issue Final Administrative Order. Id. Haughton did not contest the charges in the Notice of Intent and ICE issued a Final Administrative Removal Order. Id. Meanwhile, ICE began efforts to secure travel documents for Haughton to return to Jamaica.

---

[1] The IJ decision indicates that petitioner worked for a local catering company until his lack of a driver's license became an obstacle. Id. at 4. After he became the primary caretaker for his children, he continued to work odd jobs on weekends and half days on Friday. Id. at 5.

Id. at ¶ 10. On March 31, 2014, Jamaican officials informed ICE that they could not issue travel documents because they were unable to confirm Haughton's Jamaican birth. Id. at ¶ 12. ICE continued to detain Haughton from March to August 2014 while it tried without success to secure the necessary travel documents. Id. at ¶ 13. On September 5, 2014, Haughton was released from ICE detention and placed on an Order of Supervision. Id. at ¶ 14. He complied with that Order by reporting to the designated officials as scheduled on October 7, 2014 and March 11, 2015. Id.

In August 2015, the government secured a copy of Haughton's original Jamaican birth certificate and on September 21, 2015, ICE learned that Jamaica would issue the necessary temporary travel documents for petitioner, which would be valid through the end of October 2015. Id. at ¶ 15-16. On October 5, 2015, ICE took Haughton back into custody as an alien subject to a final order of removal. Resp. Memo., [Dkt. 5] at ¶ 4. While awaiting removal, Haughton was subject to mandatory detention pursuant to 8 U.S.C. § 1226(c) by virtue of his three criminal convictions from 2006. Id. at 2.

On October 9, 2015, while detained, Haughton applied for permanent residency through his wife, a naturalized United States citizen, by filing a Form I-130 Petition for Alien Relative. Id. at ¶ 5. On October 13, 2015, Haughton's counsel informed ICE of the application and that Haughton would seek to adjust his status to that of a lawful permanent resident if United States Citizenship and Immigration Services (CIS) approved his application. Id. The following day, ICE cancelled the Final Administrative Removal Order and instead issued a Warrant of Arrest and Notice to Appear (NTA) to place Haughton in removal proceedings pursuant to 8 U.S.C. § 1229. Id. at ¶ 6. The NTA indicated that Haughton was removable as an alien who has been convicted of a crime involving moral turpitude, 8 U.S.C. § 1182(a)(2)(A)(i)(I), and as an alien

4

who has been convicted of two or more offenses for which the aggregate sentence of confinement is five years or more, 8 U.S.C. § 1182(a)(2)(B). Id. ICE has continued to detain Haughton as an alien subject to mandatory detention under 28 U.S.C. § 1226(c). Id. at ¶ 7.

In November 2015, ICE filed the NTA with the Arlington Immigration Court. Id. at ¶ 8. On December 3, 2015, Haughton appeared for his initial master calendar hearing, where he admitted to the factual allegations in the NTA and conceded the charges of removability. Id. at ¶ 9. The case was continued so that Haughton's counsel could brief the Immigration Judge (IJ) on Haughton's eligibility to adjust his status. Id. At the second master calendar hearing on January 14, 2016, the parties determined that Haughton would be eligible to apply to adjust status if CIS approved the pending I-130 and the case was reset pending CIS's decision. Id. at ¶ 10. On February 11, 2016, the parties informed the IJ that the I-130 petition had been approved. Id. at ¶ 11.

Following the approval of his I-130 petition, Haughton filed an application for Adjustment of Status pursuant to 8 U.S.C. § 1255 and a Form I-601 Waiver of Grounds of Inadmissibility pursuant to 8 U.S.C. § 1182(h). Id.[2] A merits hearing was held on March 29, 2016 and, on May 5, 2016, the IJ issued a written decision, in which he found that Haughton had established the "exceptional and extremely unusual" hardship required for perpetrators of

---

[2] Form I-601 allows certain aliens who are "inadmissible" (i.e., ineligible to immigrate to the United States) on grounds such as a qualifying criminal conviction to request that the grounds of inadmissibility be waived. An immigration court "may, in its discretion, waive [the ground of inadmissibility for an alien convicted of a crime involving moral turpitude] in the case of an applicant who is the spouse, parent, son, or daughter of a citizen of the U.S. or an alien lawfully admitted for permanent residence if it is established to the satisfaction of the [c]ourt that the applicant's denial of admission would result in extreme hardship to the qualifying relative of such an alien. INA § 212(h)(1)(B)." IJ Decision, [Dkt. 1-1] at 10. Aliens who are convicted of violent or dangerous crimes, as burglary is construed under the INA, see Matter of Louissaint, 24 I&N Dec. 754, 759 (B.I.A. 2009), must demonstrate that a denial of admission would result in "exceptional and extremely unusual" hardship. Id. at 10-11 (citing 8 C.F.R. § 1212.7(d)).

dangerous crimes who are attempting to avoid deportation and granted Haughton's requests for both the waiver of inadmissibility and permanent residency. IJ Decision, [Dkt. 1-1] at 15. In reaching this decision, the IJ emphasized the unique emotional hardship that Haughton's deportation would cause his wife, which was accentuated by her traumatic upbringing, as well as the financial debt that she was accumulating during Haughton's detention, which "place[d] her family's housing in jeopardy." Id. at 12-13. The IJ also recognized the burden born by Haughton's children. As the IJ explained, "Based on the unsustainable financial situation in the [petitioner's] household, the young ages of the children, the [petitioner's] special role as the fulltime, primary caretaker and teacher for them while their mother works, and the adverse psychological and developmental effects they have been displaying since the [petitioner's] detention, the Court finds that the children would suffer . . . exceptional and extremely unusual [hardship] upon the [petitioner's] removal." Id. at 13-14. Observing that Haughton has "taken visible and concrete steps toward rehabilitation and worked to become a positive role model for his children," the IJ concluded that discretionary relief was warranted. Id. at 14.

ICE filed a timely Notice of Appeal with the Bureau of Immigration Appeals (BIA). Compl., [Dkt. 1] ¶ 17. The BIA established July 12, 2016 as the briefing deadline. Resp. Memo., [Dkt. 5] at 7-8. ICE filed its brief on July 11, 2016, and Haughton's counsel received a three-week extension upon request and filed on August 2, 2016. Id. at 10-11.

While awaiting resolution of ICE's appeal, Haughton sought bond. On June 8, 2016, he filed the pending petition for a writ of habeas corpus. Compl., [Dkt. 1]. He also filed a request for bond with the Immigration Court the following week. Resp. Memo., [Dkt. 5] at 11. DHS opposed the bond motion and, on July 8, 2016, the IJ denied Haughton's motion on the grounds that there was no final order and Haughton remained subject to mandatory detention. Id. One

month later, in response to petitioner's habeas petition, respondents filed their motion for summary judgment. [Dkt. 4].

## II.   DISCUSSION

The parties do not dispute the relevant facts, therefore the sole issue in this habeas petition is a question of law: whether petitioner's prolonged, mandatory detention under § 1226(c) without receiving an individualized bond hearing violates the constitutional guarantee of due process. Although several courts in this jurisdiction have summarily dismissed similarly styled claims by holding that they are barred by the Supreme Court's decision in Demore v. Kim, 533 U.S. 510 (2003), see, e.g., Tshiteya v. Crawford, No. 1:13-CV-894, 2013 WL 6635096, at *5 (E.D. Va. Dec. 16, 2013); Ozah v. Holder, No. 3:12-CV-337, 2013 WL 709192, at *5 (E.D. Va. Feb. 26, 2013); Obaido v. Lucero, No. 1:12-CV-415, 2012 WL 3257827, at *2 (E.D. Va. Aug. 8, 2012), this reasoning has been called into question by the growing weight of circuit court precedent concluding that Demore should be construed narrowly, as well as by new evidence about the duration of pre-removal detention in the United States. After reviewing the relevant Supreme Court precedent, this Court reaches the same conclusion as all six courts of appeals to confront this question, holding that "to avoid constitutional concerns, § 1226(c)'s mandatory language must be construed to contain an implicit reasonable time limitation, the application of which is subject to federal-court review." Rodriguez v. Robbins, 715 F.3d 1127, 1137-38 (9th Cir. 2013).

## A. **Standard of Review**

Summary judgment is appropriate where the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view the record in the light most favorable to the

nonmoving party, and must draw all inferences in favor of that party. See Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002). Summary judgment does not become disfavored simply because there are "important, difficult or complicated question of law." Lewis v. Coleman, 257 F. Supp. 38, 40 (S.D.W. Va. 1966); Bradacs v. Haley, 58 F. Supp. 3d 514, 521 (D.S.C. 2014).

Although Rule 56 does not provide for situations in which the court desires to enter summary judgment sua sponte, or in which the nonmoving party is entitled to summary judgment, it is widely acknowledged that courts have this power, provided that the nonmoving party has sufficient notice and opportunity to respond. Amzura Enterprises, Inc. v. Ratcher, 18 F. App'x 95, 103 (4th Cir. 2001); Calvert v. W. Va. Legal Servs. Plan, Inc., 464 F. Supp. 789, 791 (S.D.W. Va. 1979); see also Ramsely v. Coughlin, 94 F.3d 71, 73-74 (2d Cir. 1996) (holding that if a motion for summary judgment has been made, a district court may grant summary judgment to any party—including a nonmovant).

**B. Analysis**

The Immigration and Nationality Act (INA) includes a number of provisions addressing the detention of immigrants in removal proceedings. The general rule is that "an alien may be arrested and detained," on issuance of a warrant, "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Implementing regulations provide that an alien detained under § 1226(a) "may" be released on bond if "the alien . . . demonstrate[s] to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." 8 C.F.R. § 236.1(c)(8). The initial bond determination is made by an immigration officer and an alien can appeal an adverse

bond determination to an IJ and, subsequently, to the BIA. See 8 C.F.R. § 236.1(d)(1), 236.1(d)(3)(i), 1236.1(d)(1), 1236.1(d)(3(i).

A subset of aliens with criminal convictions are subject to mandatory pre-removal detention. See 8 U.S.C. § 1226(c). This class contains aliens who, for example, committed crimes involving "human trafficking, drug trafficking, crimes of moral turpitude, drug conspiracies, prostitution, firearm offenses, treason, espionage, and the like." Sylvain v. Attorney Gen. of U.S., 714 F.3d 150, 154 (3d Cir. 2013). The statute does not authorize individualized bond hearings for this class of aliens except in a narrow exception not relevant to this habeas petition. See 8 U.S.C. § 1226(c)(2) (authorizing the Attorney General to release "an alien described in paragraph (1) only if" certain witness protection considerations apply).

It is well-settled that aliens are entitled to due process during immigration proceedings. See Plyler v. Doe, 457 U.S. 202, 210 (1982). A central tenet of due process is "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint." Zadvydas v. Davis, 533 U.S. 678, 690 (2001). Although courts have upheld numerous mandatory detention schemes, the constitutionality of these schemes depends on the existence of temporal limitations. Id. at 682 (finding that "indefinite detention . . . would raise serious constitutional concerns). For example, the Speedy Trial Act adopts a presumptive limit of 90 days for pretrial detention in the criminal context, see 18 U.S.C. § 3161, and state pre-trial detention statutes include similar time restraints, see, e.g., United States v. Edwards, 430 A.2d 1321, 1332 (D.C. App. 1981).

In the context of immigration detention, the Supreme Court has held that, although brief periods of detention during immigration proceedings are consistent with due process, Demore v. Kim, 538 U.S. 510, 526 (2003), the indefinite detention of an alien physically present in the

9

United States "would raise serious constitutional concerns." Zadvydas, 533 U.S. at 682.

Petitioner's habeas claim sits at the intersection of these two principles, asking whether

prolonged detention—that which is beyond brief but short of indefinite—raises the same serious

constitutional concerns identified in Zadvydas.

Zadvydas addressed the constitutionality of § 1231(a)(6), which authorizes the Attorney

General to detain criminal aliens after the expiration of the 90-day removal period set forth in

§ 1231(a). The two petitioners were aliens subject to final removal orders who had been detained

past the 90-day removal period authorized by statute because INS had been unable to identify

countries willing to accept them. 533 U.S. at 684-85. Emphasizing that the petitioners and others

like them could be subject to potentially indefinite detention, which would raise serious

constitutional questions, the Court invoked the canon of constitutional avoidance and read the

statute as implicitly "limit[ing] an alien's post-removal-period detention to a period reasonably

necessary to bring about that alien's removal from the United States." Id. at 689. Left with

determining what constituted a "reasonable" period of detention, the Court established that if,

after six months in detention, an alien "provides good reason to believe" removal was unlikely in

the foreseeable future, the government must either demonstrate that removal was likely or grant

the alien an individualized bond hearing. Id. at 701.

Two years later, in Demore, the Supreme Court upheld the constitutionality of the

mandatory pre-removal detention provision in § 1226(c) against a facial challenge brought by an

alien who had spent six months in detention, holding that "the Government may constitutionally

detain deportable aliens during the limited period necessary for their removal proceedings." 538

U.S. at 558-59 (emphasis added). Unlike post-removal detention for aliens who, as a practical

matter, cannot be removed, pre-removal detention, the Supreme Court explained, "is a necessary

10

part of [the] deportation procedure," as deportation proceedings "would be vain if those accused could not be held in custody pending the inquiry into their true character." Id. at 523. This reasoning was underpinned by the observation that the time period required to complete these proceedings was "brief" and "limited," qualifiers that are repeated throughout the opinion. See id. at 513, 523, 526, 531. The Court's understanding of the duration of pre-removal detention was based on data provided by the Executive Office of Immigration Review (EOIR). That data represented that in 2001, § 1226(c) detention lasted "roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal." Id. at 530. Justice Kennedy wrote separately to emphasize the importance of temporal limitations, qualifying that if an alien's "continued detention became unreasonable or unjustified," he could be entitled to "an individualized determination as to his risk of flight and dangerousness." Id. at 532.

Thirteen years later, new evidence raises questions about the factual foundations of the Court's holding. In August 2016, the Office of the Solicitor General notified the Supreme Court that the data relied upon in Demore was incorrect. Pet. Mem., [Dkt 8], Ex. 1 at 1. As the Solicitor General explained, the 2001 data provided by the EOIR contained "several significant errors." Id. at 2. The average time to completion in cases where an alien did not appeal (which constituted approximately 85% of all removal cases) was 39 days, not the 47 days cited in Demore; and the average time required to complete an appeal was 141 days, not four months (approximately 120 days). Id. Relying on the EOIR's data, the Demore Court had added the average time to completion without appeal—47 days—with the average time for an appeal to be completed—four months— to reach the conclusion that aliens who chose to file an appeal were detained for an average of "five months." That calculation rested on the reasonable assumption

that the immigration-judge stage of the proceedings typically lasts the same amount of time in cases where an appeal is taken and those where it is not. But, the government has now told the Court that this assumption was incorrect. In fact, the immigration-judge stage took considerably longer in cases where the alien subsequently appeals. As a result, the total time to completion in this subset of cases was 382 days (almost 13 months) in 2001, not the five months the Court intuited. Id. at 3.

Although the EOIR has not published more recent data, it is widely recognized that "today, a non-citizen detained under section 1226(c) who contests his or her removal regularly spends many months and sometimes years in detention due to the enormous backlog in immigration proceedings." See Lora v. Shanahan, 804 F.3d 601, 605 (2d Cir. 2015). Research indicates that in 2012 the average amount of time an alien with a criminal conviction spent in removal proceedings (and, by extension, detention) was 455 days, see Mark Noferi, Cascading Constitutional Deprivation: The Right to Appointed Counsel for Mandatorily Detained Immigrants Pending Removal Proceedings, 18 Mich. J. Race & L. 63, 81 (2012), five times as long the 90 days that the Court believed was sufficient to resolve a majority of cases when Demore was decided in 2003. 538 U.S. at 529. This conclusion gains anecdotal support from recent cases regarding pre-removal detention. In Demore, the petitioner, who was held for six months, was regarded as an outlier, with the Court observing that he was detained "longer than average." Id. at 531. In recent years, pre-removal detention can last as long as four years. See Sopo v. U.S. Attorney General, 825 F.3d 1199 (11th Cir. 2016).

The burgeoning time to completion has put new pressure on Demore's holding that "the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings." Id. at 526 (emphasis added). Lower courts tasked with applying

<u>Demore</u> to prolonged periods of detention have increasingly adopted a narrow reading of the

Court's holding, emphasizing that it rested on the brevity of Demore's six-month detention and

the government's representations about the average time to completion. <u>See, e.g.</u>, <u>Reid v.</u>

<u>Donelan</u>, 819 F.3d 486, 493 (1st Cir. 2016). Confronted with instances of aliens held for fourteen

months, <u>Reid</u>, 819 F.3d at 486, eighteen months, <u>Ly v. Hansen</u>, 351 F.3d 263, 266 (6th Cir.

2003), thirty-five months, <u>Diop v. Ice/Homeland Sec.</u>, 656 F.3d 221, 226 (3d Cir. 2011), and

forty-eight months, <u>Sopo</u>, 825 F.3d at 1199, multiple circuit courts have consistently concluded

that "mandatory, and <u>indeterminate</u> detention raises severe constitutional concerns," <u>Reid</u>, 819

F.3d at 494 (emphasis added), the same concerns that induced the Supreme Court to identify an

implicit temporal limitation in the post-removal detention statute at issue in <u>Zadvydas</u>, 533 U.S.

at 689. In light of these grave concerns, six courts of appeals have interpreted § 1226(c) to

contain an implicit "reasonable time" limitation, the application of which is subject to review by

federal courts. <u>See Sopo</u>, 825 F.3d at 1213-14 (11th Cir.); <u>Reid</u>, 819 F.3d at 494 (1st Cir.); <u>Lora</u>,

804 F.3d at 614 (2d Cir.); <u>Rodriguez</u>, 715 F.3d at 1137-38 (9th Cir.); <u>Diop</u>, 656 F.3d at 231 (3d

Cir.); <u>Ly</u>, 351 F.3d at 270 (6th Cir.).

      This Court joins these circuits in concluding that the serious constitutional concerns

raised by prolonged detention require implying a reasonable time limitation in § 1226(c).

Moreover, the government is incorrect to argue that this reading of the statute misapplies the

doctrine of constitutional avoidance. Resp. Mem., [Dkt. 4] at 18. The question a court must

consider when invoking constitutional avoidance is "whether a construction of the statute is

fairly possible by which the question may be avoided." <u>Crowell v. Benson</u>, 285 U.S. 22, 62

(1932). If, on the other hand, "Congress has made its intent clear, [courts] must give effect to that

intent." <u>Miller v. French</u>, 530 U.S. 327, 336 (2000). The government argues that the statute says

13

nothing about temporal limitations therefore the government can detain an alien for however long detention proceedings last. It advanced the same argument in <u>Zadvydas</u>, reasoning that § 1231(a)'s silence as to the duration of detention was an authorization to hold aliens indefinitely. <u>See</u> 533 U.S. at 689. The Supreme Court rejected that logic, concluding instead that the statute contained an implicit "reasonable time" limitation. 533 U.S. at 682. The same is true with respect to § 1226(c). For here, as in <u>Zadvydas</u>, there is no evidence that Congress intended to authorize prolonged, unreasonable, detention without providing the alien with an individualized bond hearing. To the contrary, as the Court has acknowledged, "Congress previously doubted the constitutionality of detention for more than six months." <u>Zadvydas</u>, 533 U.S. at 701 (citing Juris. Statement in <u>United States v. Witkovich</u>, O.T.1956, No. 295, pp. 8–9).

This conclusion is further reinforced by the well-established principle that "[C]ourts interpret statutes with the presumption that Congress does not intend to pass unconstitutional laws." <u>Diop</u>, 656 F.3d at 231; <u>see also</u> <u>Clark v. Martinez</u>, 543 U.S. 371, 381 (2005) (explaining that constitutional avoidance is "a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts"). This presumption is consistent with Congress's clear instruction to the executive branch to proceed expeditiously with removal proceedings. <u>See</u> 8 U.S.C. § 1229(d)(1) ("In the case of an alien who is convicted of an offense which makes the alien deportable, the Attorney General shall begin any removal proceeding as expeditiously as possible after the date of the conviction."). This instruction, combined with data indicating that the average removal proceeding was completed in less than two months in the era in which the statute was passed, supports the conclusion that a "reasonable time" limitation is consistent with congressional intent.

14

Finally, reasonableness limitations are commonly inferred in federal statutes that raise serious constitutional questions. In the immigration context, the Supreme Court previously construed "a grant of authority to the Attorney General to ask aliens whatever questions he "deem[s] fit and proper," 8 U.S.C. § 1252(d) (1956), as limited to questions "reasonably calculated to keep the Attorney General advised regarding the continued availability for departure of aliens whose deportation is overdue." United States v. Witkovich, 353 U.S. 194, 195, 202 (1957). With regards to the duration of detention, the Second Circuit recently construed the Speedy Trial Act exclusion for persons awaiting assessments of mental competency to include an implicit reasonable time requirement. United States v. Magassouba, 544 F.3d 387, 416 (2d Cir. 2008) ("We think that implicit in this statutory exclusion is an assumption that defendant's competency proceedings will be resolved within the reasonable time requirements of due process. Otherwise, [the exclusion] could itself become the vehicle for doing what the Due Process Clause proscribes: subjecting incompetent defendants to indefinite commitment."). These cases, in conjunction with Zadvydas, reinforce the conclusion that inferring a reasonable time limitation is an appropriate way of avoiding the serious due process questions raised by prolonged detention under § 1226(c).

Despite the expanding consensus that § 1226(c) contains an implicit temporal limitation, the courts of appeals are split on the nature of this limitation. The First, Third, Sixth, and Eleventh Circuits call for individualized reasonableness reviews, while the Second and Ninth Circuits have adopted a bright-line rule that aliens are entitled to a bond hearing after six months in detention. Although there are compelling arguments on both sides of this divide, at base it reflects "a tension between legal justifications and practical considerations." Reid, 819 F.3d at 495.

As a legal matter, the six-month rule adopted by the Second and Ninth Circuit is not supported by either the text of § 1226(c) or precedent. With respect to text, unlike § 1231(a), the post-removal detention statute at issue in Zadvydas, which specified 90-days as the baseline for detention, § 1226(c) does not include a specific temporal baseline. See Sopo, 825 F.3d at 1216. Although Congress's decision to include such a baseline in § 1231(a) suggests that it believed bright-line rules were appropriate in the post-removal context, no such inference can be drawn from the text of the pre-removal detention provision in § 1226(c).

In addition, neither Zadvydas nor Demore support application of a six-month presumption in the pre-removal context. The Second and Ninth Circuits reasoned that the temporal limit in Zadvydas was transferable, but this conclusion is belied by the Supreme Court's own reasoning. In Zadvydas, although detention was theoretically temporary, in practice it was indefinite, if not permanent. As a result, the primary purpose of detention—to ensure that aliens were present at the moment of removal—was negated. In the face of potentially purposeless and endless detention, the Court established a bright-line rule. By contrast, in pre-removal proceedings, the reasonableness of detention inquiry should be based on the ongoing purpose of the statute: public safety and ensuring that aliens appear for their removal proceedings. Id. In light of the legitimate justifications for pre-removal detention, an arbitrary bright line rule is inappropriate. A six-month rule is further undercut by Demore, the case that actually dealt with § 1226(c), and which denied a due process challenge by a petitioner who had already been detained for six months, Demore, 538 U.S. at 531, implicitly disclaiming a presumption that detention becomes unreasonable after six months. See Reid, 819 F.3d at 497. Given this reasoning, even if a bright-line rule were appropriate, the six-month mark is an unsupportable place to draw the line.

Recognizing the absence of support for a six-month presumption, the First, Third, Sixth, and Eleventh Circuits have rejected a bright-line rule in favor of individualized analysis. In doing so, these courts have emphasized that "[r]easonableness, by its very nature, is a fact-dependent inquiry requiring an assessment of all of the circumstances of any given case." Diop, 656 F.3d at 234. This approach is also better suited to the realities of the pre-removal context. Aliens challenging removal orders exhibit variations in personal circumstances and available legal claims, which necessarily affect the duration of the proceedings and make a uniform rule inherently inequitable. See Ly, 351 F.3d at 271. The individualized approach to determining an appropriate period of detention has the added benefit of reducing the incentives for aliens to game a six-month cutoff by delaying immigration proceedings in the hopes of securing a bond hearing. See Sopo, 825 F.3d at 1216.

Admittedly, the individualized approach is not without practical shortcomings. As the Second Circuit noted in Lora, case-by-case analysis is inherently susceptible to inconsistent application and outcomes. 840 F.3d at 615. In addition, requiring assessment of individualized habeas pleas also increases the burdens on aliens, many of whom file pro se and are unlikely to be familiar with the intricacies of habeas litigation. See id. It also increases the workload of federal courts and forces them to assess a moving target, as detention may become more or less reasonable during the course of habeas review. See Ly, 351 F.3d at 272. Though these are all valid critiques, as the First Circuit has observed, "these are persuasive justifications for legislative or administrative intervention," see Reid, 819 F.3d at 498, not bases for courts to disregard the more legally sound approach. Individualized reasonableness is better supported by precedent and, notwithstanding the challenges associated with case-by-case analysis, courts are well-versed in applying reasonableness tests. See Ly, 351 F.3d at 273.

17

Under the individualized approach, district court judges reviewing habeas petitions challenging detention under § 1226(c) may assess whether the length of detention without affording the alien a bond hearing is reasonable. Considerations regarding whether the alien poses a safety threat or a flight risk are reserved for the prospective bond hearing. See Sopo, 825 F.3d at 1215 (explaining that "a federal court, examining the individual circumstances of the case, will decide whether the criminal alien's continued detention has become unreasonable").

In deciding which factors bear on the reasonableness of an alien's detention, this Court has surveyed the analysis employed in other circuits. There are five factors that recur across these cases and which this Court adopts here: (1) the duration of detention, including the anticipated time to completion of the alien's removal proceedings, see Sopo, 825 F.3d at 1217; Reid, 819 F.3d at 500; Flores-Powell v. Chadbourne, 677 F. Supp. 2d 455, 471 (D. Mass. 2010) (applying Ly, 351 F.3d at 263); (2) whether the civil detention exceeds the criminal detention for the underlying offense, see Sopo, 825 F.3d at 1217; Reid, 819 F.3d at 500; (3) dilatory tactics employed in bad faith by the parties or adjudicators, see Sopo, 825 F.3d at 1217; Reid, 819 F.3d at 500; (4) procedural or substantive legal errors that significantly extend the duration of detention, see Sopo, 825 F.3d at 1217; Diop, 656 F.3d at 234; and (5) the likelihood that the government will secure a final removal order, see Reid, 819 F.3d at 500; Flores-Powell, 677 F. Supp. 2d at 471.[3] Applying these factors to the habeas petition at bar, this Court concludes that petitioner's detention for over one year without having been afforded an individualized bond hearing has become unreasonable.

---

[3] The Eleventh Circuit suggests an additional factor—whether the detention facility is substantially similar to a penal institution. See Sopo, 825 F.3d at 1217. While this factor may be probative of reasonableness under the appropriate circumstances, because the conditions at the facility where petitioner is housed are not set forth in the record, this Court declines to consider this factor.

The first factor, duration, is the most important. The cases considering challenges to pre-removal detention exhibit considerable variation in the duration of detention, with courts ordering individual bond hearings after as little as five months, <u>Lora</u>, 804 F.3d at 616 n.24, and as long as four years, <u>Sopo</u>, 825 F.3d at 1199. Although there are no hard and fast parameters, courts seem to agree that "the constitutional case for continued detention without inquiry into its necessity becomes more and more suspect as detention continues past [the one and a half month average and five month maximum] thresholds" cited by the Supreme Court in <u>Demore</u>. <u>See</u> <u>Diop</u>, 656 F.3d at 234-35. And, when contemplating the "outer limits of reasonableness," the Eleventh Circuit suggested that "a criminal alien's detention without a bond hearing may often become unreasonable by the one-year mark, depending on the facts of the case." <u>Sopo</u>, 825 F.3d at 1217. Haughton has been detained for a full year, the duration of the "outer limit" suggested by the Eleventh Circuit and over twice as long as the five-month average for appealed cases that the Supreme Court relied on in <u>Demore</u>. This prolonged length of time places a significant burden on petitioner's liberty interests and supports the conclusion that the duration of detention in this case has become unreasonable.

The second factor is a comparison of the duration of detention to the length of the alien's criminal sentence. For each of Haughton's three convictions—one count of Felony Theft and two counts of Felony First Degree burglary—he was sentenced to five year, concurrent sentences. Resp. Memo., [Dkt. 4] REX A, p. 3. The IJ decision indicates that three of those years were suspended and that Haughton ultimately served eighteen months and successfully complied with the probation which followed his incarceration. [Dkt. 1], Ex. 1, at 4. Given that Haughton's sentence and the time he actually served are greater than the time he has been in pre-removal detention, this factor does not support a finding of unreasonableness.

Dilatory tactics by the parties or adjudicators, the third factor, has minimal effect on this habeas petition. The evidence presented suggests that both parties are litigating in good faith. Haughton's counsel requested one three-week extension to file his brief to the BIA, but there is no evidence or even an allegation that this request was motivated by a desire to delay the proceedings. Although the government makes much of the fact that Haughton could end his detention by conceding removability and that the delays are a result of his decision to seek adjustment of status and waiver of inadmissibility, see, e.g., Resp. Mem., [Dkt. 4] at 3, these facts are irrelevant. As the Sixth Circuit has explained, "appeals and petitions for relief are to be expected as a natural part of the process" and an alien cannot be detained indefinitely "merely because he seeks to explore avenues of relief that the law makes available to him." Ly, 351 F.3d at 272. More broadly, during the course of removal proceedings, "individual actions by various actors in the immigration system, each of which takes only a reasonable amount of time to accomplish, can nevertheless result in the detention of a removable alien for an unreasonable . . . period of time." Diop, 656 F.3d at 223. But, the central constitutional concern is the reasonableness of detention and "due process demands a better answer than 'we haven't gotten to it yet.'" Reid, 819 F.3d at 499. In this vein, the third factor does not focus on all delays, but rather on those that result from bad faith or dilatory tactics, i.e., delays for the sake of delay. Although no such circumstances are present here, it is worth mentioning that in Haughton's case delay has been caused by the government appealing the IJ's May 5, 2016 decision granting Haughton permanent residency and a waiver of inadmissibility. Had that appeal not been filed, Haughton would have been released from custody five months ago.

The fourth factor, error in proceedings, is also of limited import in this habeas proceeding. So far, there have been no reversals by the BIA. The government alleges that the IJ

20

erred in applying the "exceptional and extremely unusual" hardship standard to the facts of Haughton's case, but the appeal before the BIA is still pending. If the BIA affirms the IJ, petitioner will be granted permanent residency and released from custody. On the other hand, if the BIA reverses and remands, there will be further significant delay, a prospect that enhances the argument for granting petitioner an individualized bond hearing.

Finally, the fifth factor, likelihood of a final removal order, weights strongly in petitioner's favor on this record. One can only speculate as to how the BIA will rule on the government's appeal, but, given the favorable disposition at the IJ level, petitioner has a much stronger argument that a final removal order is unlikely to be forthcoming than does the average alien detained under § 1226(c). As Justice Kennedy explained in his concurrence in Demore, "the ultimate purpose behind the detention is premised upon the alien's deportability." 538 U.S. at 531. Stated differently, "there is a difference between the 'foreseeability' of proceedings ending and the 'foreseeability' of proceedings ending adversely." Reid, 819 F.3d at 500 (emphasis in original). Thus, "[a]s the likelihood of an imminent removal order diminishes, so too does the government's interest in detention without a bond hearing." Id. (emphasis in original). Because the IJ granted Haughton permanent residency, the foreseeability of proceedings ending adversely is relatively low and the government's interest in mandatory detention is diminished.

Taken together, the prolonged duration of petitioner's detention and the unlikelihood of removal are sufficient to outweigh the fact that his detention has, to date, been shorter than his period of incarceration. Because, on balance, the five factors support a finding that petitioner's detention has become unreasonable, this Court concludes that he is entitled to an individualized bond hearing.

21

As to the procedural framework for the bond hearing, neither the government nor the petitioner has made any argument about either the burden or standard of proof. In the absence of briefing, and in the interest of uniformity, this Court adopts the framework established by the Second, Third, and Ninth Circuits—the only courts of appeals to explicitly address these issues—and holds that the government must release the petitioner unless it can establish by clear and convincing evidence that he poses a risk of flight or a risk of danger to the community. See, e.g., Lora, 804 F.3d at 615-16; Diop, 656 F.3d at 235; Tijani v. Willis, 430 F.3d 1241, 1242 (9th Cir. 2005).

## III.   CONCLUSION

For the reasons stated above, the respondents' Motion for Summary Judgment will be denied, judgment will be entered in favor of petitioner, and the government will be instructed to provide petitioner with an individualized bond hearing within 30 days. An appropriate Order to that effect will be issued with this Memorandum Opinion.

Entered this 7th day of October, 2016.


Alexandria, Virginia

_____ /s/
Leonie M. Brinkema
United States District Judge

22